UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-CV-61402-BLOOM/VALLE

BRODERICK TAYLOR, SR., on
behalf of the Estate of Sylvia D. Taylor,

       Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security Administration,

       Defendant.

_____/

## <u>REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE</u>

THIS MATTER is before the Court on Plaintiff's Motion for Summary Judgment (ECF No. 21) and Defendant Nancy A. Berryhill's, Acting Commissioner of the Social Security Administration, Motion for Summary Judgment (ECF No. 22 ).  United States District Judge Beth Bloom has referred the Motions to the undersigned for a Report and Recommendation.  *See* (ECF No. 24).

After due consideration of the record and the parties' briefs, including Defendant's Response (ECF No. 23) and Plaintiff's Reply (ECF No. 26), having heard oral argument, and being otherwise fully advised on the matter, the undersigned respectfully recommends that Plaintiff's Motion for Summary Judgment (ECF No. 21) be **DENIED**, that Defendant's Motion for Summary Judgment (ECF No. 22) be **GRANTED**, and that the Administrative Law Judge's Decision ("ALJ's Decision") be **AFFIRMED** for the reasons set forth below.

# I.   PROCEDURAL HISTORY

On August 7, 2013, claimant Sylvia D. Taylor ("Claimant") applied for disability benefits and supplemental security income under the Social Security Act (the "Act"), 42 U.S.C § 401 *et seq.*, alleging a disability onset date of January 15, 2013.  (R. 276-96, 297-302).[1]  Claimant's claims were denied initially and again upon reconsideration.  (R. 85, 86, 113, 114).  Thereafter, Claimant requested a hearing, but passed away on November 5, 2015 before the hearing date.  (R. 139, 328).  Claimant's widowed husband, Broderick Taylor, was substituted as Plaintiff in this case,[2] and a hearing was held on June 2, 2016 before ALJ Richard J. Ortiz-Valero.  (R. 227, 46-63).  Plaintiff Broderick Taylor, appearing with counsel, testified at the hearing.  (R. 49-60).  A Vocational Expert also testified.  (R. 60-62).  On June 16, 2016, the ALJ issued a decision denying Claimant's applications and finding that Claimant was not disabled within the meaning of the Act.  (R. 25-35).

Thereafter, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's Decision the Commissioner's "final decision." (R. 1-3); *see Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Plaintiff now seeks judicial review of the ALJ's Decision.  (ECF No. 1); *see also* 42 U.S.C. § 405(g).  Both parties have moved for summary judgment, and the Motions are ripe for adjudication.

# II.   STANDARD OF REVIEW

Judicial review of the ALJ's Decision is limited to whether there is substantial evidence in the record as a whole to support the ALJ's finding and whether the ALJ applied the correct legal standards in making his determination.  *Carson v. Comm'r of Soc. Sec.*, 440 F. App'x 863, 864 (11th Cir. 2011) (internal citations omitted); *see also* 42 U.S.C. § 405(g).  "Substantial evidence is

---

[1] All references are to the record of the administrative proceeding filed as part of the Defendant's Answer.  *See* (ECF No. 18).

[2] According to the Social Security Regulations, if a claimant for Social Security disability benefits dies before receiving payment, a living person or estate may receive the unpaid or underpaid benefits associated with the claim.  20 C.F.R. § 404.503.

more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Carson*, 440 F. App'x at 864 (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)); *accord Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987) (substantial evidence is "more than a scintilla, but less than a preponderance").  A court, however, "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal citation omitted).  Even if evidence preponderates against the ALJ's Decision, a court must affirm "if the decision is supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citing 42 U.S.C. § 405(g)).  Within this narrow role, however, courts do not act as automatons.  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  Rather, they "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Id.* (citing *Bloodsworth*, 703 F.2d at 1239).

To qualify for benefits, a claimant must be disabled within the meaning of the Act.  *See* 42 U.S.C. § 423 (standard for disability insurance benefits) and § 1382 (standard for supplemental security income benefits).  A claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is one that "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

To determine eligibility, the ALJ employs a five-step sequential evaluation:

(1)     Is the person presently unemployed?
(2)     Is the person's impairment severe?
(3)     Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart. P, Appendix 1 (the "Listings")?

3

(4)    Is the person unable to perform his or her former occupation?

(5)    Is the person unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4) (evaluation process for disability insurance benefits), 416.920(a)(4) (evaluation process for supplemental security income benefits). An affirmative answer to any of the above questions leads either to the next question or, on Steps 3 and 5, to a finding of disability. *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). A negative answer to any question, other than Step 3, leads to a determination of "not disabled." *Id.*

Importantly, the burden of proof rests on the claimant through Step 4. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 n.10 (11th Cir. 2004). At Step 4, the ALJ must consider: (i) the claimant's residual functional capacity ("RFC"); and (ii) the claimant's ability to return to her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The regulations define RFC as that which an individual is still able to do despite the limitations caused by her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ will "assess and make a finding about [the claimant's RFC] on all the relevant medical and other evidence" in the case. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC assessment is used to determine whether the claimant can return to her past relevant work under Step 4, and if so, "the ALJ will conclude that the claimant is not disabled." *Phillips*, 357 F.3d at 1238 (citations omitted). If a claimant cannot return to her past relevant work, then the ALJ proceeds to Step 5. *Id.*

At Step 5, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant "can make an adjustment to other work." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Phillips*, 357 F.3d at 1239 (citation omitted). The ALJ must determine if there is other work available in significant numbers in the national economy that the claimant has the ability to perform. 357 F.3d at 1239. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. *Id.* Conversely, if the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is

4

disabled.  *Id.*  The ALJ may determine whether the claimant has the ability to adjust to other work in the national economy by either: (1) applying the Medical Vocational Guidelines (contained within 20 C.F.R. part 404, subpart P, appendix 2); or (2) using a Vocational Expert, who can opine on whether someone with the claimant's limitations can obtain employment in the national economy.  *Id.* at 1239-40.

### III.   THE HEARING RECORD

### A.   Claimant's Background and Hearing Testimony

Claimant, born in 1960, was fifty-two years old on January 15, 2013, her alleged onset date. (R. 303, 313).  She had a high school education, was able to communicate in English, and had past relevant work experience as a cook, waitress, cashier, and housekeeper.  (R. 48, 52, 60).  Claimant alleged that she was unable to work due to a papillary thyroid carcinoma, hyperparathyroidism, hypocalcemia, pemphigus of the right cheek, parathyroid adenoma, and hypertension.  (R. 330, 345).

In a September 2013 Function Report, Claimant reported difficulty standing, walking sitting, concentrating, understanding, and using her hands as a result of low calcium levels.  (R. 357-64). Claimant reported that she handled her personal care, except that someone did her hair and she was unable to eat when her hands cramped.  (R. 358).

In a Supplemental Pain Questionnaire also dated September 2013, Claimant wrote "Not Applicable" when asked whether her condition affected her ability to do housecleaning, laundry, driving, yard work, socialize, child care, or perform home maintenance.  (R. 355-56).  Claimant also reported that her hands and legs would cramp when her calcium level dropped, affecting her ability to sit, stand, walk, and shop.  (R. 355-56).

At the hearing, Claimant's husband testified that Claimant had difficulty walking and standing and felt dizzy when she stood for a while.  (R. 55).  He also testified that Claimant stopped

driving around March or April 2015.  (R. 55, 59-60).  Claimant passed away on November 5, 2015 after a heart attack.  (R. 56, 328).

### B.   Relevant Medical Records

The administrative record contains Claimant's lengthy medical history from 2012 until shortly before Claimant's death in 2015.  (R. 426-1744).  During that time, Claimant saw various doctors for a myriad of medical conditions, including hyperthyroidism, hypocalcemia, heart problems, and hand spams and cramping.  These medical records are discussed chronologically below.

### 1.   2012-2013 Medical Records

In January and February 2012, Claimant's ultrasounds revealed multiple thyroid lesions and nodules.  (R. 30-31, 797).  In addition, through early 2013, Claimant was treated for palpitations and high blood pressure.  (R. 31).

In July 2013, Claimant was hospitalized at Broward Health for one week and underwent a complete thyroidectomy and parathyroidectomy for thyroid cancer.  (R. 31, 447).  Claimant was diagnosed with malignant neoplasm of the thyroid gland, acute respiratory failure, essential hypertension, obesity, hyperkalemia, hyperthyroidism, and parathyroid gland.  (R. 31, 447).

Claimant returned to the hospital in mid-July and August 2013 complaining of hand cramping, difficulty speaking, and generalized weakness, likely caused by fluctuating calcium levels (hypocalcemia and hypercalcemia).  (R. 31, 426, 435, 543, 557, 670-71, 715).  A CT scan of her head was normal and an MRA showed a possible A-ccom aneurysm.  (R. 31, 426, 568, 591).  Claimant's EKG was abnormal and an angiography confirmed a cerebral aneurism.  (R. 31, 567).  The cause of Claimant's hypercalcemia was noted as possibly supplemental to her parathyroidectomy.  (R. 31).  Claimant also reported blurred vision and flashing lights, likely resulting from her brain aneurysm.  (R. 31, 762, 765).  Despite these medical reports, throughout this time Claimant had normal motor and extremity findings, and full upper and lower extremity

6

range of motion upon examination.  (R. 426, 436, 545, 554, 559, 563, 672, 683, 697, 699, 703, 705, 707, 709, 711, 713, 716, 720, 764, 802).

In September 2013, Claimant returned to Broward Health's emergency room with complaints of cramping in her hands and face, but had normal musculoskeletal and neurological findings upon examination.  (R. 952-53).  Claimant was diagnosed with hypocalcemia and anxiety, and was discharged the same day.  (R. 955-56).

In follow-up visits in September and October 2013 at Broward Health Endocrinology and with Dr. Shmaila Ishaq, Claimant had normal physical examinations, including normal extremity, neurological, and musculoskeletal findings.  (R. 777-78, 785-86, 869-73).  In November 2013, Claimant reported problems with hand spasms to Dr. Ishaq, but denied any numbness or tingling, and again had normal physical examinations.  (R. 31, 865-66).  In a December 2013 visit to Dr. Ishaq, Claimant reported some dizziness when standing and left knee stiffness, but did not report any upper extremity problems and again had normal physical examinations, although a left knee x-ray showed a large spur.  (R. 32, 862-63, 946).

2.  *2014 Medical Records*

Claimant saw orthopedic hand surgeon Dr. Deepak Kapila on three occasions in 2014: twice in January and once in March.  In January, Claimant visited Dr. Kapila for pain, numbness, and tingling in the fingers of her right hand.  (R. 847).  Upon examination, Dr. Kapila found that Claimant had "somewhat restricted" right wrist movement and positive Tinel sign and Phanel test, indicative of carpal tunnel syndrome. *Id*.  Nonetheless, Claimant was found to have full range of motion in all other right upper extremity joints.  *Id*. An x-ray showed a bony abnormality in Claimant's right wrist.  *Id*.  Dr. Kapila recommended that Claimant use a splint, warm water soaks, and do range of motion exercises for the right wrist.  *Id*.  In a follow-up visit later that month, Claimant reported similar symptoms in her left hand, and Dr. Kapila prescribed splints for both wrists.  (R. 846).

7

In the March 2014 visit to Dr. Kapila, Claimant reported pain, numbness, and tingling in the radial digits of the right hand.  (R. 845).  Dr. Kapila again found some positive Tinel's sign and Phalen's test over the median nerve at the right and left wrist, consistent with carpal tunnel syndrome.  *Id*.  Among the possible treatment alternatives, Dr. Kapila discussed with Claimant surgery to decompress the median nerve on the left wrist.  *Id*.  Claimant was to consider her options and follow-up in four weeks.  *Id*.  There is no record of any follow-up with Dr. Kapila or any subsequent surgery or other treatment for Claimant's hands.

In February 2014, Claimant visited Dr. Ricardo Vicuna, a cardiologist.  At this visit, Claimant was asymptomatic and "doing fairly well overall," with full range of motion in her extremities. (R. 919).  Claimant denied joint pain/stiffness or difficulty walking.  (R. 918).

In March 2014, Claimant saw Dr. Mufa Ghadiali, her treating surgeon for hyperparathyroidism.  (R. 835).  At this visit, Claimant reported "doing well" and had "no complaints" except "intermittent" tingling in her fingers (which the doctor opined may be related to carpal tunnel and possibly intermittent hypocalcemia).  (R. 835).

In April and May 2014, Claimant underwent various tests.  For example, blood test results in April 2014 were consistent with diabetes.  (R. 32, 851).  Also in April, Claimant reported to cardiologist Dr. Vicuna with complaints of chest pains and palpitations and mild labored breathing when talking on the phone.  (R. 32, 916).  During this visit, Dr. Vicuna summarized test results from 2013, noting that the Holter monitor nuclear stress test confirmed a normal ejection fraction and no evidence of ischemia or defect consistent with myocardial infarct.  (R. 32, 916).  At that visit, Claimant had a normal physical examination with full range of motion in her extremities and adequate peripheral pulses.  (R. 917).  In May 2014, diagnostic testing indicated an abnormal methacholine study, but normal pulmonary function study.  (R. 32, 996-97).

In early August 2014, Claimant visited the Broward Health emergency room for complaints of bilateral arm and foot tingling, but had normal musculoskeletal and neurological findings upon

examination, including normal range of motion and strength.  (R. 32, 1162, 1164).  Claimant was diagnosed with hypertension and neuropathy, received blood pressure medication, and was discharged the same day in stable and improved condition.  (R. 1166).  Later in August, a diagnostic cerebral angiography revealed the body and dome of the anterior communicating artery was well obliterated.  (R. 32, 1133).  The vessel was not affected by coils or thrombus and the flow across the anterior communicating artery to the right anterior cerebral artery was preserved.  (R. 32, 1133).

Although Claimant continued to seek treatment for various complaints through 2014, she did not complain about her hands and none of that treatment was related to her upper extremities.[3]  In fact, throughout these visits, Claimant had normal musculoskeletal and neurological findings upon examination.  (R. 1169, 1181, 1184, 1253-54, 1282-83, 1302, 1349).

### 3.  2015 Medical Records

 In January 2015, a nuclear iodine scan was negative for residual or recurrent thyroid cancer, Claimant's blood pressure was asymptomatic, and Claimant was advised to continue with her medication regimen.  (R. 33, 1218-19, 1251-52).

In February 2015, Claimant visited the Broward Health emergency room with complaints of chronic chest pain.   (R. 33,  1577).   Claimant  was  diagnosed  with  hypocalcemia, hypoparathyroidism, a history of papillary thyroid cancer, acute kidney injury, and hypertension.  (R. 33, 1578, 1581).  During this visit, Claimant also complained of constant, non-radiating severe cramping and intermittent tingling in both hands, legs, and feet, and stuttering speech beginning the day before.  (R. 33, 1588).  After a normal physical examination, Claimant was diagnosed with hypocalcemia.  (R. 33, 1585, 1589-91).

---

[3] For example, in September 2014, Claimant complained of chest pains.  (R. 1168).  In October 2014, Claimant underwent a gynecological examination, follow-up for pemphigus foliaceus, and a blood pressure check-up.  (R. 1181, 1184, 1253).  In December 2014, Claimant complained of painful toe nails.  (R. 1190).

In April 2015, Claimant visited Dr. Ishaq for treatment of post-surgical hypoparathyroidism, papillary thyroid cancer, and post-surgical hypocalcemia.  (R. 33, 1295).  Claimant's physical examinations were normal and, with regard to her thyroid cancer and hypocalcemia, her TSH and calcium levels were at target.  (R. 33, 1296).  Moreover, although Claimant's fasting glucose level was reportedly impaired, her renal function, creatinine, and EGRF had improved from March 2015. *Id.*

In May 2015, Claimant had a follow-up visit with cardiologist Dr. Vicuna.  (R. 33, 1259). Although Claimant reported some dizziness, she had no other symptoms, her blood pressure was well controlled, and she had normal physical findings.  (R. 33, 1259-60).

In June 2015, Claimant underwent check-ups for her skin condition (pemphigus foliaceus), but did not report any upper extremity complaints.  (R. 1286, 1345).

In July 2015, Claimant went to the hospital for chest pain and constipation, but did not report any upper extremity complaints.  Claimant had unremarkable extremity, neurological, and musculoskeletal findings upon examination.  (R. 1388-90, 1395-1400, 1402, 1408-14, 1569-76).

 In August 2015, Claimant was treated for back pain, sleep apnea, and a headache, but did not report any upper extremity issues and generally had unremarkable extremity, neurological, and musculoskeletal findings upon examination.  (R. 33, 1357-59, 1421-24, 1637-40).

In September 2015, Claimant was hospitalized for approximately one week for complaints of abdominal pain, headaches, and blurred vision.  (R. 1595-1644). Claimant suffered a stroke during the hospitalization.  (R. 1480, 1599).  The treatment notes, however, do not reflect any complaints or abnormal findings regarding Claimant's upper extremities.  (R. 1480, 1482-83, 1485-86, 1489-90, 1494-95, 1507, 1514, 1519, 1528-29, 1539-40, 1595-96, 1604, 1620).  The ALJ noted that Claimant had multiple organ problems and was not operative due to her multiple problems.  (R. 33, 1599).  Claimant was diagnosed with a traumatic kidney injury, severe anemia, leukocytosis,

enterococcus faecalis bacteremia and sepsis, mild hyponatremia, benign hypertension, hypoalbuminemia, and diabetes mellitus type 2.  (R. 33, 1524).

### C.    Vocational Expert's Testimony

The Vocational Expert testified that Claimant's past relevant work included work as a fast food cook (medium work with an SVP of 5), waitress (light, semi-skilled work with an SVP of 3), and a cashier and housekeeper (both light, unskilled work with an SVP of 2).  (R. 60); *see also* (R. 35).

The ALJ questioned the Vocational Expert involving a hypothetical individual of Claimant's age, education, and previous work experience, who could lift and carry 20 pounds occasionally and 10 pounds frequently, could stand, walk and/or sit for six hours in an eight-hour day, and could frequently reach overhead and in all other directions with both extremities.  (R. 60-61).  In addition, the individual could never be exposed to unprotected heights, concentrated dust, odors, gases, fumes or operate a motor vehicle; could only occasionally be exposed to extreme cold, heat, vibrations; and could frequently be exposed to humidity and wetness.  According to the Vocational Expert, such an individual could perform Claimant's past relevant light work as a waitress and cashier.  (R. 61).

If, however, the same individual were further limited to sedentary work, such as lifting and carrying ten pounds occasionally and less than ten pounds frequently and standing or walking for two hours in an eight-hour day, that individual could not perform any of Claimant's past relevant work.  *Id.*

### IV.    THE ALJ'S DECISION

After reviewing the evidence and conducting the requisite five-step analysis, the ALJ concluded that Claimant "has not been under a disability within the meaning of the Social Security Act since January 15, 2013," the alleged onset date.  (R. 25).

At Step 1, the ALJ determined that Claimant has not engaged in substantial gainful activity since January 15, 2013, the alleged onset date.  (R. 27).

At Step 2, the ALJ found that Claimant had the following severe impairments: thyroid carcinoma, hyperthyroidism, hypocalcemia, hypertension, diabetes, spur of the left knee, neuropathy, asthma, chronic kidney disease, and obesity.  (R. 27).

At Step 3, the ALJ concluded that Claimant did not have an impairment or combination of impairments that meets or medically equal the severity of one of the Listings.  (R. 27-29).

At Step 4, the ALJ determined that Claimant had the residual functional capacity to perform "light work," except that the Claimant could lift and carry 20 pounds occasionally and 10 pounds frequently, and could sit, stand and/or walk for 6 hours in an 8 hour day.  (R. 29).  The Claimant was also limited to frequently reaching overhead in all directions with both upper extremities, but could never be exposed to unprotected heights, concentrated dust, odors, gases, fumes, or operate a motor vehicle.  *Id*.  Lastly, Claimant could occasionally be exposed to extreme cold, heat, and vibrations, and could frequently be exposed to humidity and wetness.  *Id*.

In reaching this conclusion at Step 4, the ALJ considered Claimant's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, as well as opinion evidence.  (R. 27).  Although the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ concluded that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (R. 29-30).  Ultimately, the ALJ determined that Claimant was capable of performing her past relevant work as a waitress and cashier (both light level jobs) and did not proceed to Step 5 of the evaluation process.  (R. 34-35).

## V.     DISCUSSION

Claimant raises two arguments on appeal, both focusing on Claimant's use of her hands to handle, finger and feel.  Hr'g Tr. 4:10-15.  First, Plaintiff argues that the ALJ committed reversible error in giving "partial weight" to the medical opinion of Dr. Margaret Grano, a specialist in internal and emergency medicine who reviewed Claimant's medical records and opined on Claimant's limitations.  (ECF No. 21 at 9-12).  Second, Plaintiff asserts that the ALJ erred by failing to incorporate Claimant's severe hand limitations into the RFC analysis.  *Id.* at 12-15.  As discussed below, the undersigned finds that the ALJ applied the proper legal standards and that the ALJ's Decision is supported by substantial evidence.  Accordingly, the ALJ's Decision should be affirmed.

### A.  The ALJ Properly Weighed Dr. Grano's Opinion

Social Security regulations require the ALJ to consider and evaluate every medical opinion received in determining whether a claimant is disabled.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").  Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).

In weighing medical opinions, Social Security regulations require an ALJ to consider certain factors, including: (1) whether the claimant has an examining or treating relationship with the medical source; (2) the medical source's area of specialization; (3) whether the medical source's opinion is well-supported; and (4) whether the opinion is consistent with the record as a whole.  20 C.F.R. §§ 404.1527(c)(i)-(v), 416.927(c)(i)-(v).  Moreover, an ALJ must generally give controlling

weight to the opinion of a treating source[4] about the nature and severity of a claimant's impairments if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."   §§ 404.1527(c), 416.927(c)(2).

When an ALJ does not give controlling weight to a treating source's opinion, the ALJ must "clearly articulate" good cause for discounting it.[5]  *Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1240-41).  Indeed, the opinion of a non-examining source "is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision." *Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990) (citing *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985).

### 1. Dr. Grano's Medical Opinion

At the Commissioner's request, Dr. Grano completed a Medical Source Statement ('MSS") and a Medical Interrogatory Physical Impairment Form ("Interrogatory Form") (collectively, "Dr. Grano's Opinion").   (R. 1745-55).   To complete these forms, Dr. Grano reviewed the Claimant's medical records through September 2015.  *Id.*

---

[4] A "treating source" is the claimant's own medical source who has provided the claimant with medical treatment or evaluation, and who has had "an ongoing relationship" with the claimant.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  An "ongoing relationship" generally means the claimant sees, or has seen, the physician or psychologist "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)."  *Id.*  A medical source who has "treated or evaluated [the claimant] only a few times or only after long intervals (*e.g.*, twice a year)" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition."   *Id.* Conversely, a medical source is *not* a treating source if the relationship "is not based on [the claimant's] need for treatment or evaluation, but solely on [the claimant's] need to obtain a report in support of [the claim] for disability."  *Id.*

[5] "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'"  *Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1241).

With reference to the Interrogatory Form, most relevant to Claimant's arguments are Dr. Grano's responses to Questions 5 through 7, and 9.  In response to Question 5, Dr. Grano checked a box reflecting that there was insufficient evidence to allow her to form an opinion about the nature and severity of Claimant's impairments.  (R. 1752).

In response to Question 6, Dr. Grano identified Claimant's impairments as: "(1) Hypoparathyroidism causing periodic derrangement [sic] of calcium metabolism (too high, too low) with symptoms of hand "spams" (tetany) and tingling; (2) chronic headaches following treatment (coiling of cerebral aneurysm); and (3) recent (9/17/2015) left occipital stroke with reported visual disturbance and acute debilitation following hospital stay for infection (9/12-9/26) – neurology note 9/16; no deficit except visual deficit confirmed 9/17 with MRI."  (R. 1752).

In response to Question 7, Dr. Grano opined that, based on the medical evidence, Claimant's impairments do not meet or equal a Listing.[6]  (R. 1753).  Dr. Grano further explained:

> [Claimant] has hypoparathyroidism (following Thyroid cancer) – She has had intermittent acute hospital stays for low calcium levels or high calcium levels (she has symptoms of spasms [and] tingling in hands).  The documented exams are normal.  She responds to treatment (hospitalized 2-3 days).  In between episodes, visits with Endocronologist. [N]ormal exams (she [complains of] tingling).  Also noted normal musculoskeletal [and] neurology exam when visiting other specialists. . . . I cannot say that [Claimant] has persistent symptoms as most notes do not suggest this . . .  episodic – more documentation between hospital stays needed to suggest significant residual . . . ** [t]here is one note that attributes hand tingling to carpal tunnel syndrome. The degree of impairment is not noted – Treatment splint.

(R. 1753).

In response to Question 9, which asked the doctor to identify any functional limitations or restrictions resulting from Claimant's impairments, Dr. Grano wrote:

---

[6] In what appears to be a continuing response to Question 7, Dr. Grano identified the records that she reviewed regarding Claimant's: (i) hypoparathyroidism (including numerous hospitalizations for calcium treatment, function/exam at follow-up and PT appointments, and carpal tunnel syndrome); (ii) frequent headaches following coiling of cerebral aneurysm on 8/2013, and (iii) "bad hospitalization" from 9/12-9/26/15, during which Claimant suffered a stroke.  (R. 1753, 1755).  Dr. Grano noted that since Claimant's September 2015 hospital discharge, there was no additional neurology, ophthalmology, or visual fields testing so "it [was] unclear if [Claimant] ha[d] residual impairments" resulting from that hospital stay.  (R. 1755).

I cannot fully comment – However, regarding the Parathyroid Disease, because symptoms are intermittent [and] respond to treatment[] between hospital stays[,] I would not expect deficits regarding hand spasms or tingling.  [Claimant] should be able to use hands (As in [Question] 7).  Regarding walking, most recently she was provided a rolling walker post discharge 9/26/2015, however, there has been no subsequent evaluation provided.  I cannot comment on walking, climbing, crouching.  I would expect her to be able to sit for long periods, lift though cannot comment about amount.

(R. 1754).

In addition to the Interrogatory Form, Dr. Grano completed a Medical Source Statement.  In the MSS, as in the Interrogatory Form, Dr. Grano stated that she could not comment on Claimant's ability to lift, carry, stand, or walk, and needed "follow up documentation since 9/26[/15]" to assess Claimant's functioning in exertional (lifting, carrying) and postural (climbing, balancing, stooping, kneeling, crouching, crawling) activities.  (R. 1745-48).  Dr. Grano also opined in the MSS (as in Question 7 of the Interrogatory Form) that based on "noted normal exam/neurology exam of hands/arms during most visits," Claimant could frequently reach overhead and in all directions and continuously handle and finger with both arms/hands.  (R. 1747).   Dr. Grano also found that Claimant could sit for a total of eight hours in a workday.  (R. 1746).  Lastly, Dr. Grano again opined that Claimant could never be exposed to dust, odors, fumes, pulmonary irritants, and could only frequently be exposed to humidity and wetness.  (R. 1749).

Lastly, Dr. Grano wrote that she was "unable" to form an opinion within a reasonable degree of medical probability as to the date on which the Claimant's limitations first presented or whether the limitations lasted or would last for 12 consecutive months.  (R. 1750).

2.  *The ALJ Properly Assessed Dr. Grano's Opinion*

The ALJ gave Dr. Grano's opinion "partial weight."  (R. 34).  In so doing, the ALJ stated:

Margaret Grano, a medical expert, opined that the claimant could sit for 8 hours, never be exposed to unprotected heights, operating a motor vehicle, or be exposed to dust, odors, fumes, or pulmonary irritants; occasionally be exposed to extreme cold, extreme heat, and  vibrations; and frequently be exposed to humidity and wetness (Ex. 45F).  Partial weight is accorded to this opinion.  Dr. Grano is a specialist who had the opportunity to examine all the record evidence, and her opinion is consistent

with the substantial evidence in the medical record . . . .  However, partial weight is
given to this opinion because Dr. Grano was not able to give an opinion with regard
to claimant's exertional or postural limitations."

(R. 34).

Plaintiff argues that the ALJ erred by giving Dr. Grano *any* weight at all.  Specifically,
Plaintiff asserts that there was insufficient evidence for Dr. Grano to "form an opinion to a
reasonable degree of medical certainty about the nature and severity of Claimant's impairments"
and thus, that the ALJ's reliance "to any degree" on Dr. Grano's opinion taints the ALJ's Decision.
(ECF No. 21 at 9-11).  Plaintiff's arguments, however, are unpersuasive.

Contrary to Plaintiff's argument that Dr. Grano's Opinion was "uncertain in nature," *see*
(ECF No. 21 at 10), Dr. Grano responds clearly regarding the matters upon which she was opining,
and specifies the matters on which she was reserving opinion.  Indeed, Dr. Grano responded to all
sections and sub-questions in the MSS and Interrogatory Form, and carefully explained the basis for
her findings, including specific references to the medical evidence in the record.  *See generally*
(R. 1745-55).  Accordingly, and for the reasons discussed below, the undersigned finds that the ALJ
did not err in assigning "partial weight" to Dr. Grano's opinion.

The ALJ's Decision makes clear that "partial weight" was given to those portions of the
MSS and the Interrogatory Form where Dr. Grano expressed an opinion (based on her review of the
evidence) regarding environmental and hand limitations, but not to those parts on which Dr. Grano
declined to opine (i.e., Claimant's exertional and postural limitations) because of insufficient
medical evidence.  (R. 34).  In this regard, the ALJ clearly stated his reasoning and explained that
"partial weight is given to this opinion because Dr. Grano was not able to give an opinion with
regard to claimant's exertional or postural limitations."  *Id.*  But Dr. Grano provided an opinion
regarding Claimant's environmental limitations, her ability to sit for eight hours, and her ability to
reach overhead and in all directions and continuously handle and finger with both arms/hands.  *Id.*
Importantly, Dr. Grano supported her opinion regarding Claimant's ability to handle and finger with

cites to the medical record, including Claimant's "normal exam/neurology exam of hands/arms during most visits." (R. 1747). Moreover, the ALJ was not required to give Dr. Grano's opinion any specific weight and the assignment of partial weight was not error.[7] *Baez v. Comm'r of Soc. Sec.*, 657 F. App'x 864, 869 (11th Cir. 2016) (citing *Lewis*, 125 F.3d at 1440). Accordingly, the undersigned finds that the ALJ sufficiently stated his reasons for evaluating Dr. Grano's opinion, which were supported by substantial evidence.

### 3. Substantial Evidence Supports the ALJ's Decision

Evidence from a non-examining medical expert is considered opinion evidence. *Tagle v. Astrue*, 279 F. App'x 827, 829 (11th Cir. 2008) (citation omitted). The weight given to a non-examining physician's opinion depends on its clinical findings and consistency with other evidence. 20 C.F.R. §§ 404.1527(b)-(c), 416.927(b)-(c). Although they are not treating or examining physicians, the opinions of a medical expert for example, may outweigh the medical opinion of a treating source. 20 C.F.R. §§ 404.1527(f)(1), 416.927(f); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996) (providing that opinions of State Agency medical and psychological consultants must be treated as expert opinion evidence).

Here, in light of the record as a whole, the ALJ evaluation of Dr. Grano's Opinion is supported by substantial evidence. For example, the ALJ acknowledged that in 2013 and 2014, Claimant had complained about her hands and fingers, but Claimant's physical examinations were normal. *See, e.g.*, (R. 31) (referencing a November 2013 complaint of hand spasms, but reporting normal physical exam); (R. 32) (noting a March 2014 complaint of intermittent tingling of fingers, which may have been related to carpal tunnel and possibly intermittent hypocalcemia). The ALJ also noted that although Claimant complained about her upper extremities through 2014 and 2015,

---

[7] Relatedly, the ALJ concluded that Claimant had greater limitations on the number of hours that she could sit than those reflected in Dr. Grano's opinion. *Compare* (R. 29) (providing an RFC where claimant could sit for only 6 hours in an 8 hour workday) with (R. 34) (summarizing Dr. Grano's opinion that claimant could sit for 8 hours).

she generally had unremarkable physical examinations and received conservative treatment for hypocalcemia.  *See, e.g.*, (R. 32) (August 2014 emergency room visit where Claimant complained of bilateral arm and foot tingling, but her condition was noted to be improved and stable on discharge); (R. 33) (referencing Claimant's January 2015 emergency room visit for numerous complaints, including severe cramping pain to both hands and intermittent tingling of the hands and feet, but noting normal physical examinations resulting in hypocalcemia diagnosis).   Thus, substantial evidence supported Dr. Grano's Opinion regarding Claimant's manipulative limitations.[8] *See, e.g.*, *T.R.C. ex rel. Boyd v. Comm'r of Soc. Sec. Admin.,* 553 F. App'x 914 (11th Cir. 2014) (concluding that the ALJ properly gave substantial weight to the opinion of a non-examining source because the doctor provided supporting explanation for the opinion and it was supported by the record); *Key v. Comm'r of Soc. Sec.*, No. 12-CV-415-OC-18PRL, 2013 WL 4774768, at *7 (M.D. Fla. Sept. 4, 2013) (finding no error in the ALJ's reliance on the testimony of a non-examining medical expert who reviewed the entire record and opined on claimant's limitations); *Forsyth v. Comm'r of Soc. Sec.*, 503 F. App'x 892, 893 (11th Cir. 2013) (affirming the ALJ's decision to give more weight to the opinion of non-examining doctor); *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873-74 (11th Cir. 2011) (holding that the ALJ did not err in relying on the reports of non-examining physicians "because their opinions were supported by the record"); *Ogranaja v. Comm'r of Soc. Sec.*, 186 F. App'x 848, 851 (11th Cir. 2006) (holding that substantial evidence supported the ALJ's decision to assign great weight to non-examining physicians' opinions that "were supported by and consistent with the record as a whole").

---

[8] Plaintiff also argues that Dr. Grano's Opinion "should not have even been admissible in this case" under Federal Rule of Evidence 702 (regarding expert witnesses).  (ECF No. 21 at 10).  Notably, however, although an ALJ may be *guided* by the Federal Rules of Evidence, the ALJ is not *bound* to apply them.  *See* 20 C.F.R. § 498.217.  Moreover, Dr. Grano is a specialist in internal and emergency medicine, and an expert in her field.  Accordingly, the ALJ did not err in considering Dr. Grano's opinion regarding Claimant's ability to finger and handle.

In addition, the ALJ did not rely solely on the opinion of Dr. Grano to find that Claimant had no manipulative limitations.  *See, e.g.*, *Ogranaja*, 186 F. App'x at 851 (finding no error where the ALJ did not rely solely on State Agency physician's opinion).  Rather, the ALJ also considered and evaluated the medical opinions of Dr. James Patty (a State Agency medical consultant) and Dr. Mufa Ghadiali (Claimant's treating doctor for hyperparathyroidism).  (R. 34).  These doctors, like Dr. Grano, concluded that Claimant had no manipulative restrictions.[9]  For example, Dr. Patty opined that Claimant could do a full range of light work, with no manipulative limitations.[10] (R. 97, 109).  Similarly, Dr. Ghadiali opined that Claimant had no functional limitations on sitting, standing, and walking, and had no significant manipulative limitations in reaching, handling, or fingering.[11] (R. 1551-52).  The ALJ adequately explained his reasons for assigning "partial weight" to these opinions and adopted more restrictive exertional, environmental, and manipulative limitations than those found by Drs. Patty, Ghadiali, and Grano.  (R. 34).

Lastly, Plaintiff argues that the ALJ had a duty to recontact Dr. Grano or other doctors to more fully develop the record.  *See* (ECF No. 21 at 11).  Social Security Regulations provide that in situations where the ALJ may not be able to make a determination because the evidence in the record is insufficient or inconsistent, the ALJ *may* need to take additional action, including re-contacting a medical source or requesting additional evidence.  20 C.F.R. §§ 404.1520b(b)(2)(i)-(ii), 416.920b(b)(2)(i)-(ii)(emphasis added).  But that is not the situation here.  As Plaintiff conceded during the hearing before the undersigned, the universe of records in this case is static and cannot be supplemented due to Plaintiff's passing.  Hr'g Tr. 26:24-27:6.  Moreover, the ALJ is not required to

---

[9] Plaintiff does not challenge the weights assigned to Drs. Patty or Ghadiali, and the undersigned finds no error in the evaluation of these opinions.

[10] The ALJ found that Claimant had "further manipulative and environmental limitations than those found by Dr. Patty," and gave Dr. Patty's opinion only "partial weight."  (R. 34).

[11] Despite Dr. Ghadiali's status as a treating source, the ALJ gave "partial weight" to his opinion as "not entirely consistent with the objective and other substantial medical evidence of record."  (R. 34).  The ALJ concluded that claimant "has further exertional and manipulative limitations than those found by Dr. Ghadiali." *Id*.

seek additional expert testimony when, as here, the record contains opinions from several physicians and there is sufficient evidence for the ALJ to make an informed decision. *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999); *Prunty v. Acting Comm'r of Soc. Sec. Admin.*, 635 F. App'x 757, 759-60 (11th Cir. 2015) (finding that an additional evaluation of a medical expert was neither necessary nor required where the record contained multiple medical evaluations and opinions).  Moreover, although the ALJ has a basic duty to develop a full and fair record, it is Claimant who bears the burden of proving that she is disabled and producing evidence to support her claim. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (citations omitted).

Ultimately, it is the ALJ's duty to weigh the medical evidence. *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (reiterating that the ALJ is to weigh the evidence and make credibility determinations).  Here, the ALJ properly weighed the medical opinions, applied the proper legal standards, and the ALJ's determination is supported by substantial evidence.[12]

### B.  The ALJ Properly Determined Claimant's RFC

A claimant's RFC is the most a claimant can do despite the limitations caused by her impairments.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Social Security regulations classify the physical exertion requirements for work as sedentary, light, medium, heavy, and very heavy. *See* 20 C.F.R. §§ 404.1567, 416.967.  Along with age, education, and work experience, the ALJ considers a claimant's RFC in determining whether the claimant can work. *Lewis*, 125 F.3d at 1440 (citation omitted).  An RFC determination is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. *Id*.  In the end, the responsibility

---

[12] Relatedly, the undersigned also rejects Claimant's argument, made in passing in her brief and at the hearing before the undersigned, that the ALJ should have sought an expert medical opinion regarding whether Claimant met or equaled a Listing and whether the Grids applied. *See* (ECF No. 21 at 12); Hr'g Tr. 28:21-31:1.  First, Claimant's counsel conceded during the 2016 ALJ hearing that this was not a Listings case.  (R. 49).  Second, arguments raised in a perfunctory manner, without supporting arguments or legal citation, are generally deemed waived. *N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418 (11th Cir. 1998).  Lastly, counsel confirmed during the hearing before the undersigned that the Grids are not an issue in this case.  Hr'g Tr. 4:17-5:4.

for determining a claimant's RFC rests with the ALJ, and the ALJ is not required to give any special significance to the opinion of medical sources in determining the RFC. *Lewen v. Comm'r of Soc. Sec.*, 605 F. App'x 967, 968 (11th Cir. 2015) (upholding ALJ's RFC finding that accounted for medical opinions not specifically discussed by the ALJ). For the reasons discussed below, the undersigned finds no error in the ALJ's RFC determination.

Plaintiff argues that the ALJ erred in determining Claimant's RFC by not including "any limitations to [Claimant's] use of her hands and arms for handling, fingering, and feeling." (ECF No. 21 at 13); *see also* Hr'g Tr. 14:13-18. This argument is unavailing.

At Step 2, the ALJ found that Claimant's severe impairments included thyroid carcinoma, hyperthyroidism, hypocalcemia, hypertension, diabetes, spur of the left knee, neuropathy, asthma, chronic kidney disease, and obesity. (R. 27). Although Claimant's hand spasms and tingling are documented and may have been caused by hypocalcemia or carpal tunnel syndrome, *see, e.g.*, (R. 835, 845, 847), it was Claimant's burden to establish the existence of a severe impairment. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999) (internal citation omitted). Claimant, however, failed to meet her burden.

Nonetheless, Claimant asserts that the ALJ failed to consider treatment notes from her neurologist and orthopedic hand surgeon in determining her RFC. (ECF No. 21 at 13). But as Claimant conceded during the hearing before the undersigned, *none* of these treatment notes contain any limitations or restrictions on Claimant's use of her hands or fingers. *See, e.g.*, Hr'g Tr. 15:7-15; 19:16-19 (conceding that doctor did not specify manipulative limitations); 24:2-5 ("No, [the doctors] did not impose specific limitations according [to] what we would need to see in the Social Security rules for an adjudicative hearing . . . ."). Rather, these notes reflect a diagnosis of possible carpal tunnel syndrome and hypocalcemia, either of which may have resulted in cramping and tingling in Claimant's hands and legs. Case law is clear that a diagnosis alone is insufficient to establish the severity of an impairment or any resulting work-related limitations. *Wood v. Astrue*,

No. 8:10-CV-2373-T-17AEP, 2012 WL 834137, at *5 (M.D. Fla. Feb. 14, 2012) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005)), *adopted*, No. 8:10-CV-2373-T-17AEP, 2012 WL 834132 (M.D. Fla. Mar. 13, 2012); *see also* Hr'g Tr. 19:22-23 (conceding that a diagnosis alone does not result in a work-related limitation).  Simply put, the mere existence of an impairment does not reveal the extent to which the impairment may limit or affect a claimant's ability to work. *Moore*, 405 F.3d at 1208 n.6.  Rather, the severity of a medically ascertained impairment must be measured by its effect upon the ability to work and not simply in terms of deviation from purely medical standards of bodily perfection or normality.  *Wood*, 2012 WL 834137, at *10 (citations omitted).

Here, the ALJ fully considered Claimant's complaints about cramping and tingling in her hands.  For example, the ALJ noted that in November 2013, Claimant complained of hand spasms, but denied numbness and tingling, and her physical examination was normal.  (R. 31).  Similarly, the ALJ noted that in March 2014, Claimant reported that she was doing well despite intermittent tingling of her fingers, which may have been related to carpal tunnel and possibly intermittent hypocalcemia.  (R. 32).  The ALJ also noted that in March 2014, Claimant visited the orthopedic surgeon and reported numbness and tingling in her right hand and, at that time, Claimant had positive Tinel's and Phalen's testing.  *Id*.  As well, the ALJ noted a August 2014 emergency room visit at which Claimant complained of bilateral arm and foot tingling.  *Id*.  The ALJ also referenced a February 2015 emergency room visit, at which Claimant complained of severe cramping to both hands.  (R. 33).  Ultimately, however, the records reflect only Claimant's diagnosis and treatment, and are silent as to any resulting work-related limitations from Claimant's condition.  In fact, contrary to Plaintiff's argument, Drs. Patty, Ghadiali, and Grano all opined that Claimant had no significant manipulative limitations.  *See* (R. 97, 109, 1552, 1747, 1753, 1754).

After considering the medical evidence, the ALJ included a number of postural, exertional, reaching, and environmental limitations in Claimant's RFC.  (R. 27).  The ALJ determined that

Claimant could do "light work," except that the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently, sit, stand and/or walk for 6 hours in an 8 hour day, frequently reach overhead in all other directions with both upper extremities, and never be exposed to unprotected heights, concentrated dust, odors, gases, fumes, or operate a motor vehicle.  (R. 29).  These limitations adequately address Claimant's impairments as reflected in the medical records.

Plaintiff also argues that the ALJ erred in not including any limitations on "reaching, handling, fingering, feeling, and manipulative limitations" in the hypothetical posed to the Vocational Expert.  (ECF No. 21 at 14).  Claimant's argument fails for various reasons.  First, the ALJ's hypothetical did, in fact, limit Claimant to 'frequently reaching overhead and in all other directions with both extremities."  (R. 61).  Second, the ALJ is "not required to include findings in the hypothetical that the ALJ has properly rejected as unsupported." *Crawford*, 363 F.3d at 1161; *see also Norman v. Comm'r of Soc. Sec.*, No. 8:14-CV-1498-T-30MAP, 2015 WL 4397150, *8 (M.D. Fla. July 16, 2015) (the ALJ submits to the expert only those limitations supported by the objective evidence of record) (internal citations omitted); *Denomme v. Comm'r of Soc. Sec.*, 518 F. App'x 875, 879 (11th Cir. 2013) (internal citations omitted) ("[A]n ALJ is not required to instruct the VE to assume conditions that he does not find exist.").  As detailed previously, substantial evidence supports the ALJ's determination not to include additional manipulative limitations into the RFC.  *See, e.g.,* (R. 1604) (reflecting "[f]ine finger movements are normal . . . [c]oordination is intact, sensation is intact to touch, pinprick, vibration."); *see also* Hr'g Tr. 43:15-18.

In short, Claimant has not met her burden of showing a severe impairment or how her hand symptoms would have resulted in more restrictive functional limitations than those imposed by the ALJ.  *See, e.g.*, *Hubbard v. Comm'r of Soc. Sec.*, 618 F. App'x 643, 650 (11th Cir. 2015) (although Plaintiff's conditions were serious, "the medical records did not indicate any functional limitations related to [them]").  Thus, the undersigned finds no error in the ALJ's RFC determination, which is supported by substantial evidence in the record.

## VI.    RECOMMENDATION

Accordingly, the undersigned respectfully **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (ECF No. 21) be **DENIED,** that Defendant's Motion for Summary Judgment (ECF No. 22) be **GRANTED,** and that the ALJ's Decision be **AFFIRMED** for the reasons set forth above.

Within **fourteen** (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations as provided by the Local Rules for this district. 28 U.S.C. § 636(b)(1); S.D. Fla. Mag. J. R. 4(b) (allowing 14 days for written objections unless a different time is prescribed by the Court).  The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation.  11th Cir. R. 3–1 (2018); *see Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND ORDERED** at Chambers, in Fort Lauderdale, Florida, on August 10, 2018.

ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE

cc: U.S. District Judge Beth Bloom
    All Counsel of Record